UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                                :
SHANNON R. MOST,                                :       CASE NO. 1:17-CV-1195
                                                :
         Plaintiff,                             :
                                                :
v.                                              :       OPINION & ORDER
                                                :       [Resolving Doc. No.14]
BWXT NUCLEAR OPERATIONS                         :
GROUP, INC.,                                    :
                                                :
         Defendant.                             :
                                                :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Plaintiff Shannon Most alleges that Defendant BWXT Nuclear Operations Group, Inc. ("BWXT") violated Ohio anti-discrimination laws by firing him. Plaintiff Most claims that BWXT fired him because he has a disability, and that BWXT refused to accommodate his disability, and retaliated against him for asserting his legal rights. BWXT now seeks summary judgment on all of these claims.[1]

For the following reasons, the Court **GRANTS** Defendant BWXT's motion for summary judgment.

**I. Factual Background**

Plaintiff Most has a diagnosed case of social anxiety disorder.[2] For the last several years, he has been taking medication for that condition.[3]

---

[1] Doc. 14-1. Plaintiff opposes. Doc. 15. Defendant BWXT replies. Doc. 16.
[2] Plaintiff Most claims that he was originally diagnosed in 1998, but he believes the original practice that diagnosed him has closed. *See* Doc. 15-3 at 1.
[3] While Plaintiff Most states that he has taken anti-anxiety medication for over a decade, the only medical documentation he provided is a history of his prescription refills for the past two years. *Id.* at 8-10.

This disorder prevents Most from speaking in front of groups larger than three or four people.[4] When Most is forced to speak to such groups, he can have panic attacks or even faint.[5]

Defendant BWXT manufactures nuclear reactor components for the U.S. Navy. On April 4, 2016, BWXT hired Plaintiff Most to work as a Senior Numerical Control Programmer (hereinafter "NC Programmer") at its Euclid, Ohio facility.[6] As an NC Programmer, Plaintiff worked on programs that would control complex manufacturing tools.[7] This task requires proficiency in 3-D modeling software such as Pro-E and Top Solid.[8] BWXT only profits from NC Programmers' work when they perform billable design work on client projects.[9]

During his job application process, Plaintiff did not disclose that he had social anxiety disorder.[10] Based on the online job description provided when he applied, Most believed that the NC Programmer work was sufficiently solitary work that it would not trigger his disorder.[11]

Plaintiff began working for BWXT at the same time as another new NC Programmer, Mike Paulocsak.[12] BWXT provided the two new hires with essentially the same training schedule, although Plaintiff Most claims that Paulocsak had easier access to help from more experienced programmers as well as his own personal copy of one of their work programs.[13]

After two weeks of training, Most had not progressed as quickly as expected.[14] On April 28, 2016, about four weeks after Plaintiff Most started training, John Yahnert, one of Most's supervisors, spoke with Most and told Most that he was not adequately progressing through his

---

[4] *See* Doc. 15-1 at 11.
[5] *See generally* Doc. 15-4.
[6] Doc. 13-1 at 29, 31.
[7] *Id.* at 23-25.
[8] *Id.* at 23.
[9] Doc. 14-4 at 2.
[10] Doc. 13-1 at 30.
[11] *Id.*
[12] Doc. 14-4 at 7.
[13] Doc. 13-1 at 52-56.
[14] Doc. 14-4 at 2-3.

training.[15] On May 3, Most told BWXT by email that he was taking three days off in order to catch up on online training and to re-evaluate whether he was suitable for the NC Programmer position.[16]

On May 8, Plaintiff Most informed Defendant BWXT that he had spoken with the Ohio Unemployment Agency as well as other people with a human resources background, and that he wished to inform BWXT that he had a social anxiety disorder protected by the Americans with Disabilities Act.[17] In the same email, Most said that since being hired, he had become aware of several job requirements not listed in the original online job description that he either could not do or would require an accommodation to complete.[18] Over the next weeks of his employment, Most had several conversations with BWXT and its representatives, both in person and by email, discussing his need for accommodation.[19]

It is unclear how Most's restrictions affected the billable portions of his work. NC Programmers generally worked on billable projects alone. Only when the machining equipment has broken down do NC Programmers need to speak with others.[20] When breakdowns occur, the NC Programmer facilitates a conversation with two to four others, but the NC Programmer does not make a presentation on the breakdown.[21] The NC Programmer only needs to respond to comments and questions from others joining the effort to return the equipment to operation.[22]

---

[15] Doc. 13-1 at 71.
[16] Doc. 13-5.
[17] Doc. 13-7.
[18] *Id.*
[19] *See* Docs. 13-6, 13-7, 13-8, 13-9, 13-11.
[20] *See* Doc. 13-1 at 75; Doc. 14-3 at 15.
[21] *Id.*
[22] *Id.*

Case No. 1:17-cv-1195
Gwin, J.

During this process, BWXT requested medical documentation supporting Most's social anxiety disorder diagnosis.[23] Defendant BWXT gave Most until May 31, 2016 to provide those documents.[24] On that day, Most informed BWXT that he did not have the documents it requested because the practitioner who diagnosed him had apparently gone out of business.[25] Instead, Most informed BWXT that he had booked an appointment with his current doctor to receive a new diagnosis and provided several years of prescription records from his pharmacy.[26] These records reflected that Most had regularly taken a drug prescribed for social anxiety disorder for at least the past several years.[27]

On May 24, Most's supervisor had a conversation with him about his lack of improvement.[28] Every NC Programmer hired by Defendant BWXT in the eight years before Most had completed training and begun performing billable work within four weeks.[29] Most, however, had not begun billable work after over six weeks of training.[30] Mike Paulocsak, the NC Programmer hired at the same time as Most had performed billable work in less than four weeks.[31]

BWXT terminated Most on June 6, 2016.[32] Plaintiff Most states that before he was fired, he attempted to provide further medical documentation to Defendant BWXT, but it rejected those documents.[33] Most's termination letter stated three reasons for his firing: (1) his

---

[23] Doc. 15-1 at 9.
[24] *Id.*
[25] *Id.* at 8.
[26] *Id.*
[27] *Id.*
[28] Doc. 14-4 at 4-5.
[29] *Id.* at 2.
[30] *Id.* at 4-5.
[31] *Id.* at 3.
[32] Doc. 15-3 at 4.
[33] *Id.*

Case No. 1:17-cv-1195
Gwin, J.

performance was subpar; (2) his requested accommodation was not feasible; and (3) he failed to provide adequate documentation of his diagnosis.[34]

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[35] First, the moving party must demonstrate that there is no genuine dispute as to a material fact entitling it to judgment.[36] Once the moving party has done so, the non-moving party must show specific record facts – not its allegations or denials in pleadings – showing a triable issue.[37] The non-moving party must show more than some doubt as to the material facts in order to defeat a motion for summary judgment.[38] But, the Court views the facts and draws all reasonable inferences from those facts in favor of the non-moving party.[39]

When parties present competing versions of the facts on summary judgment, a district court adopts the non-movant's version of the facts unless incontrovertible evidence in the record directly contradicts that version.[40] Otherwise, a district court does not weigh competing evidence or make credibility determinations.[41]

## III. Analysis

Plaintiff Most brings claims against Defendant BWXT for disability discrimination, refusal to accommodate, and protected activity retaliation. Ultimately, all of Most's claims

---

[34] Doc. 13-18.
[35] *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 580 (6th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).
[36] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[37] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[38] *Id.* at 586.
[39] *Killion*, 761 F.3d at 580 (internal citations omitted).
[40] *See Scott v. Harris*, 550 U.S. 372, 380 (2007).
[41] *Koren v. Ohio Bell Tel. Co.*, 894 F. Supp. 2d 1032, 1037 (N.D. Ohio 2012) (citing *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 470 (6th Cir. 2012)).

-5-

Case No. 1:17-cv-1195
Gwin, J.

suffer the same fatal flaw: he has provided no evidence that would allow a reasonable jury to find that BWXT fired him because of his disability instead of his well-documented failure to perform his job's core function of producing billable work.

**A. Disability Discrimination and Retaliation**

Plaintiff Most claims that Defendant BWXT discriminated against him because of his disability and retaliated against him for engaging in protected conduct related to his disability in violation of Ohio law.[42] To establish a *prima facie* case of disability discrimination, an employee must show: (1) that he is disabled within the meaning of the law; (2) that the employer took some adverse employment action against him at least in part because of his disability; and (3) that he could safely and substantially perform the essential functions of the job with or without reasonable accommodation.[43]

If an employee establishes this *prima facie* case, the burden shifts to the employer to provide a nondiscriminatory reason for the adverse employment action.[44] If the employer gives a nondiscriminatory reason, the burden shifts back to the employee to show that the proffered reason is a pretext for discrimination.[45]

Plaintiff Most can attempt to show pretext by proving that BWXT's stated nondiscriminatory reasons for termination were insufficient to merit his firing, that its stated reasons for his firing were factually false, or that BWXT did not honestly believe in its stated reasoning.[46]

---

[42] Because of the similarity between Ohio anti-discrimination law and the federal Americans with Disabilities Act, courts may look to federal cases and regulations when interpreting Ohio's law. *See Columbus Civ. Serv. Comm. v. McGlone*, 697 N.E.2d 204, 206-07 (1998).
[43] *Stewart v. Bear Mgmt., Inc.*, 2017 WL 4325821, at *3-4 (Ohio Ct. App. Sept. 27, 2017).
[44] *Id.*
[45] *Id.*
[46] *See Singleton v. Select Specialty Hospital-Lexington, Inc.*, 391 Fed. App'x 395, 400 (6th Cir. 2010) (citing *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1984)).

-6-

Case No. 1:17-cv-1195
Gwin, J.

To state a retaliation claim, an employee must prove that: (1) the employee engaged in a protected activity; (2) the employer knew that the employee had engaged in the protected activity; (3) the employer engaged in some retaliatory conduct; and (4) a causal link exists between the protected activity and the adverse employment decision.[47] "If the evidence indicates that an employer 'would have made the same employment decision regardless of the employee's participation in the protected activity, the employee cannot prevail.'"[48]

Most's discrimination and retaliation claims fail because he has not shown that he could perform the essential functions of an NC Programmer, regardless of his requested accommodation. He also has not shown that BWXT's stated motivation for firing him – his performance issues – was a pretext for either discrimination or retaliation.

In its termination letter, BWXT offered three reasons for why it fired Most: he did not meet the company's performance standards; his requested accommodation was unreasonable; and he failed to provide BWXT with the requested medical documentation of his disability.[49] Regardless of these last two stated reasons, BWXT was entitled to fire Most because of his inability to perform.[50]

Four facts contradict Most's argument that his performance woes were merely pretext for a discriminatory or retaliatory firing. First, Defendant warned Most that he was not performing

---

[47] *HLS Bonding v. Ohio Civ. Rights Comm.*, 2008 WL 3522994, at *3 (Ohio Ct. App. Aug. 14, 2008).
[48] *Id.* (quoting *Motley v. Ohio Civ. Rights Comm.*, 2008 WL 2026426, at *2 (Ohio Ct. App. May 13, 2008)).
[49] Doc. 13-18.
[50] Because the Court decides that no issue of material fact exists regarding whether Most was able to perform the essential functions of the position even with his requested accommodation, the Court need not decide whether Most provided adequate documentation of his disability or whether his requested accommodation was unreasonable. *See Idemudia v. J.P. Morgan Chase*, 434 Fed. App'x 495, 505 n.7 (6th Cir. 2011) ("When a defendant presents multiple legitimate, nondiscriminatory reasons for the [adverse] action, . . . the plaintiff must demonstrate that each independently sufficient reason is a pretext for illegal discrimination.").

Case No. 1:17-cv-1195
Gwin, J.

adequately before he ever self-identified as having a disability.[51] This fact alone could defeat Most's claims.[52]

Second, BWXT provided Most with additional training above and beyond what most new hires needed.[53] This additional training occurred after Most had requested accommodation and identified himself as having a disability.[54]

Third, Most argues for his competency in two ways: (1) that he was capable of performing billable work, but BWXT withheld that work from him after he self-identified; and (2) that he performed some billable work after he self-identified but did not bill that work because he had a question about billing practices that went unanswered.[55]

The second strand of this argument is supported by record evidence that undercuts the first. Plaintiff Most states that he performed approximately fifty hours of billable work after he self-identified, but had issues with billing logistics.[56] In his deposition, Most clarified that this billable work was performed alongside his trainer, and was used partially, if not primarily, as a training exercise.[57] This shows that BWXT was both providing Most with billable work

---

[51] Doc. 14-4 at 3.
[52] *See Hamilton v. General Elec. Co.*, 556 F.3d 428, 440 (6th Cir. 2009) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.")).
[53] Doc. 14-4 at 4-5.
[54] *Compare id.* (noting that Most was provided with additional training after May 10, 2016) *with* Doc. 13-7 (self-identifying on May 8, 2016).
[55] *See, e.g.*, Doc. 15-3 at 3 (noting that billable work only becomes available when the company provides an NC Programmer with an "MDL binder"). Most also states in his declaration that NC Programmer Paulocsak was not given billable work until after Most self-identified. This statement contradicts what Most said in his deposition, Doc. 13-1 at 57-58 ("Mike Paulocsak had MDL materials to work on at week three."). The Court can disregard such self-serving inconsistent statements. *See U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 303 (6th Cir. 1998) ("[A] party cannot avoid summary judgment through the introduction of self-serving affidavits that contradict prior sworn testimony.").
[56] Doc. 15-3 at 2-3.
[57] *See* Doc. 13-1 at 106-07.

Case No. 1:17-cv-1195
Gwin, J.

opportunities and continuing to train him at a time that was both after Most self-identified and after all of its previous NC Programmer hires had completed their new hire training.

Fourth, and finally, Mike Paulocsak, the other new NC Programmer, began the same day and received essentially the same training as Most. This makes Paulocsak the closest and most obvious comparator to Most. In spite of the similarity in the training they received, Paulocsak was capable of performing billable work by his fourth week at BWXT, while Most never performed billable work on his own.[58]

Ultimately, the record evidence presents only one plausible timeline of Most's employment with BWXT. In the four weeks before he self-identified, BWXT gave Most the same training as its other newly hired NC Programmers.[59]

By the point in his tenure with BWXT when Most self-identified as having a disability, virtually all other NC Programmers hired in the past eight years had completed training and begun performing billable work.[60] Plaintiff Most, however, had not yet performed any billable work.[61]

After he self-identified, BWXT continued to provide Most with training and opportunities to improve.[62] In spite of this, the record shows that the only billable work that Most was ever able to perform occurred as part of his training, and was done alongside his trainer.[63] These facts do not support an inference of discrimination or retaliation.

---

[58] Doc. 14-4 at 3; *see also Hopkins v. Canton Bd. of Educ.*, 2010 WL 2572830 (N.D. Ohio June 23, 2010) (noting that the lack of a similarly-situated comparator usually dooms a plaintiff's claim of discrimination).
[59] Doc. 14-4 at 2.
[60] *Id.* at 3.
[61] *Id.*
[62] *See, e.g.*, Doc. 13-1 at 106-07.
[63] *See* Doc. 13-1 at 107 ("Most: It seemed that [the trainer] was instructing me every step of the way . . . . Counsel: . . . [The Trainer] was the one who was writing the program and having you with him to use as a teaching moment for you, right? Most: Yes, for part of the time. . . . I would guess three days, and then part of the time I think we were to read some other – some brand new training manual.").

Case No. 1:17-cv-1195
Gwin, J.

Most's argument that two supervisors once made off-hand, seemingly dismissive comments towards him after he self-identified does not create a genuine dispute of fact.[64] Likewise, Most's perception that his trainer and supervisor paid less attention to him after he self-identified does not create a factual dispute.[65] Neither of these facts suggests pretext in the face of Most's documented and uncontroverted failure to timely complete his required training.[66]

Plaintiff Most fails to establish a genuine dispute of material fact regarding his ability to perform the required functions of an NC Programmer. For this reason, the Court **GRANTS** Defendant BWXT's motion for summary judgment on Most's disability discrimination and retaliation claims.

**B. Failure to Accommodate**

A plaintiff must make five showings in order to establish a *prima facie* case of disability discrimination for failure to accommodate. He must show that: "(1) he is disabled within the meaning of the Act; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) his employer knew or had reason to know about his disability; (4) he requested an accommodation; and (5) the employer failed to provide the necessary accommodation."[67]

Most's accommodation claim fails for two reasons. First, because he has offered no evidence that BWXT failed to accommodate his disability while he was employed there. Second, because he was not "otherwise qualified" for the position.

---

[64] *Id.* at 83; Doc. 13-9.
[65] *See* Doc. 15-3 at 3.
[66] *See Shepard v. Griffin Services, Inc.*, 2002 WL 940110, at *4 (Ohio Ct. App. May 10, 2002) ("[I]solated or ambiguous discriminatory remarks are insufficient to support a claim for discrimination.").
[67] *Garlock v. Ohio Bell Telephone Co., Inc.*, 2015 WL 5730737, at *2 (N.D. Ohio Sept. 29, 2015) (quoting *Melange v. City of Center Line*, 482 F. App'x 81, 84 (6th Cir. 2012)).

-10-

Case No. 1:17-cv-1195
Gwin, J.

BWXT did state in Most's termination letter that it viewed Most's requested accommodation – conducting shutdown and other meetings by email or other means – as unreasonable.[68] Most, however, never advanced far enough into his employment that his requested accommodation was necessary. Plaintiff Most claims his anxiety condition disabled him from speaking to larger groups. But at no time during Most's training was he required to interact in groups large enough to trigger his social anxiety disorder.

During his training, Most was invited to attend some meetings with enough people to potentially trigger his anxiety.[69] However, Most either did not attend or was excused from all of those meetings.[70] He presents no facts that suggest that he was disciplined in any way for not attending.

As such, to the extent that he requested accommodation for his training, BWXT did accommodate Most. Ohio law did not require BWXT to accommodate him further once it became clear that, regardless of any accommodation, he was unable to perform the tasks that would make his work billable.[71]

Additionally, as discussed previously, Most was not "otherwise qualified" to perform the essential functions of an NC Programmer. The Code of Federal Regulations defines the term "qualified" to mean "that the individual . . . with or without reasonable accommodation, can perform the essential functions of [his] position."[72] In spite of his paper qualifications, Most's time at BWXT showed that he was not able to perform an NC Programmer's essential functions.

---

[68] Doc. 13-18.
[69] Doc. 13-1 at 77-80.
[70] *Id.*
[71] *See, e.g., Dillbeck v. Huntington Nat. Bank*, 2005 WL 1266690, at *4 (S.D. Ohio May 26, 2005) ("Plaintiff's claim fails because she cannot produce evidence showing that, apart from her disability, she can perform at the minimum standards necessary for the position.")
[72] 29 C.F.R. § 1630.2(m).

-11-

Case No. 1:17-cv-1195
Gwin, J.

The "otherwise qualified" inquiry determines whether an employee is qualified to perform a job's requirements *ex ante*. It is not meant to evaluate on-the-job performance.[73]

Here, while Most's previous experience led BWXT to believe that he was "qualified" for the position, Most's failure to complete the initial job training in a reasonable amount of time disproved that original belief.[74] BWXT justifiably expected a certain minimum competency in a number of programming and modeling tasks from its NC Programmers.[75] Because Most could not complete these tasks, he was not otherwise qualified for the NC Programmer position. The law, therefore, did not require BWXT to provide him with his requested accommodation.

For these reasons, the Court **GRANTS** Defendant's motion for summary judgment on Most's failure to accommodate claim.

## IV. Conclusion

The Court **GRANTS** Defendant BWXT's motion for summary judgment.


IT IS SO ORDERED.


Dated: December 12, 2017             s/      *James S. Gwin*
                                     JAMES S. GWIN
                                     UNITED STATES DISTRICT JUDGE

---

[73] *See McCullough v. Bd. of Ed. of Canton City School Dist.*, 2017 WL 3283995, at *9 n.18 (N.D. Ohio Aug. 2, 2017) (quoting 29 C.F.R. § 1630.9, App'x A).
   A hypothetical example helps to explain this point. If Most had completed his training and shown that he was capable of performing the basic requirements of the NC Programmer position, he would be "otherwise qualified" for the position. If, after reaching this minimum threshold, Most created sloppy billable work, then BWXT might still have a nondiscriminatory reason for firing him. But, it could not argue that he was not qualified. *Cf. id.*

[74] *See also* Doc. 13-1 at 24 (noting that at the time of his interview process, Most "certainly did not know some of the software . . . that I was later – that I had to work on").

[75] *See* Doc. 15-2 at 51 (requiring in its online job description that NC Programmers "[d]evelop NC code/programs using Pro-E/Pro-Man or Top Solid for Mill-Turns, lathes, 4 & 5 axis machining centers to meet process requirements").

-12-